# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CRIMINAL CASE NO. 1:18-cr-00146-MR-WCM

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **O R D E R** |
| | ) | |
| **TANNER MOREN EAGLE LARCH,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for a New Trial [Doc. 85] and his Renewed Motion for Acquittal [Doc. 87].

## I.    BACKGROUND

On December 4, 2018, Tanner Moren Eagle Larch (the "Defendant") was charged in a Bill of Indictment with a single count of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). [Doc. 1].  On January 7, 2019, the Defendant made his initial appearance and was appointed counsel.  On January 9, 2019, the Defendant was arraigned and pled not guilty to the count in the Bill of Indictment.

On July 17, 2019, the Defendant was charged in a Superseding Bill of Indictment with two counts of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).  [Doc. 37].  On

July 19, 2019, the Defendant was arraigned and pled not guilty to both counts in the Superseding Bill of Indictment.

The Defendant appeared for a jury trial on January 6, 2020, and January 7, 2020. At the close of the Government's proof, the Defendant made an oral Rule 29 motion for a judgment of acquittal, which the Court denied. Upon the conclusion of the Defendant's evidence, he renewed his Rule 29 motion, which the Court again denied. The parties thereafter presented closing arguments to the jury. The jury rendered a guilty verdict on both counts on January 7, 2020. [Doc. 83].

On January 21, 2020, the Defendant filed the present Motion for a New Trial [Doc. 85], and a Renewed Motion for Acquittal [Doc. 87]. The Government has responded to both motions, [Docs. 93, 94], and the Defendant has waived his reply. [Doc. 95].

Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

### A.    Rule 29 Motion for Acquittal

When confronted with a post-verdict motion for judgment of acquittal, the Court must assess whether, taking the evidence in the light most favorable to the Government, a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. See

United States v. Higgs, 353 F.3d 281, 313 (4th Cir. 2003) (holding that a conviction must be sustained if there is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt") (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc)).  When a defendant challenges a jury's verdict on the basis of insufficient evidence, "the verdict will be sustained if, when the evidence is viewed in the light most favorable to the government, there is substantial evidence to support it."  United States v. Sullivan, 455 F.3d 248, 260 (4th Cir. 2006).  "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  United States v. Young, 609 F.3d 348, 355 (4th Cir. 2010) (quoting Burgos, 94 F.3d at 862).  In determining the issue of substantial evidence, the Court does "not reweigh the evidence or the credibility of witnesses, but assume[s] that the jury resolved all contradictions in the testimony in favor of the Government."  United States v. Roe, 606 F.3d 180, 186 (4th Cir. 2010).  Further, in reviewing the evidence, the Court must "not analyze evidence in a piecemeal manner, but must consider its cumulative effect . . . ."  Burgos, 94 F.3d at 871; United States v. Cote, 544 F.3d 88, 98 (4th Cir. 2008) (noting that the evidence must be reviewed "in its totality, not in isolation, and the

government need not negate every possible theory of innocence").  As such, in reviewing the jury's verdict, the question is not whether the Court is convinced of the defendant's guilt beyond a reasonable doubt but rather whether the evidence presented at trial, viewed in the light most favorable to the Government, "could support any rational determination of guilty beyond a reasonable doubt."  United States v. Powell, 469 U.S. 57, 67 (1984).  The Court is mindful that it "may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable."  Burgos, 94 F.3d at 862.  Rather, the Court can reverse a jury's verdict only "if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt." Id.

## B.  Rule 33 Motion

A defendant's motion for a new trial is a discretionary matter for the Court to resolve.  A district court may order a new trial if the evidence weighs so heavily against the verdict that to deny a new trial would be contrary to the "interest of justice."  Fed. R. Crim. P. 33(a).  The Court's review is much more expansive when considering a motion for a new trial as opposed to a motion for acquittal.  "In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most

favorable to the government. Thus, it may evaluate the credibility of the witnesses." <u>United States v. Arrington</u>, 757 F.2d 1484, 1485 (4th Cir. 1985)

## III.    TRIAL EVIDENCE

On September 14, 2018, Jackson County Sheriff's Department Sergeant Christopher Cabe was on duty at Smoky Mountain High School in Sylva, North Carolina. [T. at 4]. Sergeant Cabe was working at a football game that evening between Smoky Mountain High School and Cherokee High School. [Id. at 21]. At some point, Sergeant Cabe received a text from a supervisor telling him to be on the lookout for the Defendant, who was reportedly at the game and was armed. [Id. at 5-6, 43]. The text Sergeant Cabe received also contained a photograph of the Defendant. [Id. at 6].

After receiving the text, Sergeant Cabe began searching for the Defendant. [Id. at 6]. Shortly thereafter, Sergeant Cabe encountered an individual that he described as an American Indian male, with tattoos on his throat, a very short haircut, and some type of red jacket. [Id. at 11]. Sergeant Cabe testified that the individual matched the photograph he received of the Defendant. [T. at 8]. When Sergeant Cabe asked the individual for his name, he identified himself as Tanner Larch. [Id.]. After the individual identified himself, Sergeant Cabe tried to grab him, but the individual pulled back and ran away from Sergeant Cabe while reaching towards his own

waistband. [Id. at 9]. As the individual was running, Sergeant Cabe saw him drop a firearm and heard it make a metallic sound as it hit the ground. [Id. at 10]. Sergeant Cabe retrieved the firearm, cleared it, and placed it in his pocket. [Id. at 11-13]. While he was doing so, the individual who dropped the firearm ran out of his sight. [Id. at 11]. The firearm the individual dropped was later identified as an Armi Tanfoglio, Model 38C, .380 caliber pistol (the "Armi Tanfoglio pistol"). [T. at 144].

Trey Hamilton, III, a former student-athlete at Smoky Mountain High School, was also at the football game that evening. [Id. at 45-46]. Hamilton was standing in the school parking lot with his friends when they were approached by an individual carrying a gun. [Id. at 47-49]. Hamilton described that individual as having "tattoos, like, all on his arms and . . . neck[,]" "kind of short" hair, and wearing a "white tee" with "a couple of designs." [Id. at 49]. According to Hamilton, the individual who approached them said he needed a ride and "requested the vehicle." [Id. at 50]. When the individual got closer and had his back turned, Hamilton "picked him up in a bear hug" and one of Hamilton's friends "took the gun away and placed it on the ground." [T. at 50-51]. After dropping the gun, the individual ran away from Hamilton and his friends towards the woods. [Id. at 51, 56]. One of

Hamilton's friends cleared the firearm and placed the firearm, the bullet, and the magazine on the ground. [Id. at 55, 79].

Shortly thereafter, Hamilton and his friends flagged down Jackson County Sheriff's Department Sergeant Ernie Scherman, who was looking for the individual Sergeant Cabe encountered earlier. [Id. at 61, 76]. Hamilton and his friends told Sergeant Scherman that "a guy had just tried to carjack them and that they had taken a gun from him, and that they had the gun." [Id. at 61]. Sergeant Scherman took possession of the firearm, the magazine, and the bullet. [Id. at 62]. The gun was later identified as a Glock Model 23, .40 caliber pistol (the "Glock pistol"). [T. at 139].

On a nearby road, Jackson County Sheriff's Department Sergeant Brandon Hooper was also searching for the individual Sergeant Cabe had encountered earlier. [Id. at 89]. While he was driving his patrol car near the High School, he saw an individual who "met the description of Tanner Larch." [Id. at 90]. Sergeant Hooper pulled over, got out of his patrol car, and ordered the individual to stop. [Id.]. The individual, however, ran away up a steep hill into a wooded area. [Id. at 91]. Sergeant Hooper pursued the individual, deployed his taser, and ultimately arrested him. [Id. at 94]. Sergeant Hooper said that the individual he arrested "was a male" with "two tattoos on his neck" who identified himself as Tanner Larch. [T. at 95].

Sergeant Hooper radioed to the other officers that he had located and arrested the Defendant on a nearby road.  [Id. at 14].  Sergeant Cabe came to the scene and confirmed that the individual Sergeant Hooper had arrested was the same person that had dropped the firearm and identified himself as Tanner Larch.  [Id.].  At the time of his arrest, the Defendant was wearing a white shirt but did not have a red jacket.  [Id. at 18, 118-19].

## IV.    DISCUSSION

In order to convict the Defendant for possessing a firearm in violation of 18 U.S.C. § 922(g)(1), the Government was required to prove beyond a reasonable doubt that: (1) the Defendant knowingly possessed a firearm; (2) the Defendant has been convicted of a crime punishable by imprisonment for a term exceeding one year; (3) the Defendant knew he had been convicted of such a crime; and (4) the firearm had been shipped or transported in interstate or foreign commerce.  18 U.S.C. § 922(g)(1); United States v. Royal, 731 F.3d 333, 337 (4th Cir. 2013) (citation omitted); Rehaif v. United States, 139 S. Ct. 2191, 2200 (2019) ("We conclude that in a prosecution under 18 U.S.C. § 922(g) . . .  the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm.").

The parties stipulated at trial that the Defendant was a convicted felon. [Doc. 36]. The evidence that the firearms had been shipped or transported in interstate or foreign commerce and regarding the Defendant's knowledge of his felony conviction, was uncontroverted. As the Defendant notes, the issue "for the jury was whether the Defendant possessed those firearms." [Doc. 91 at 4].

## A.    Defendant's Renewed Motion for Acquittal

The Defendant presents two arguments in his motion for acquittal. The Defendant first contends that there is insufficient evidence to support the jury's verdict because no witness provided an in-court identification of the Defendant as the individual who possessed either firearm. [Doc. 92 at 1, 5]. The Defendant further argues that the conviction was based on suggestive identification procedures that violated his due process rights. [Id. at 8].

### 1.    In-Court Identification

To begin, there is no requirement that the Government provide an in-court identification as part establishing guilt beyond a reasonable doubt because "a courtroom identification is not required to show sufficient evidence of a defendant's identity if other evidence of identity is sufficient." United States v. Morris, 575 F. App'x 174, 176 (4th Cir. 2014) (citing United States v. Taylor, 900 F.2d 779, 782 (4th Cir. 1990)). As such, "[a] witness

9

need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime." <u>Taylor</u>, 900 F.2d at 782 (citing <u>Delegal v. United States</u>, 329 F.2d 494 (5th Cir. 1964); <u>United States v. Darrell</u>, 629 F.2d 1089, 1091 (5th Cir. 1980)). For example, the Fourth Circuit has found that a conviction under 922(g)(1) was supported by substantial evidence even though there was no in-court identification because "the jury heard extensive testimony from multiple witnesses who saw, chased, and apprehended [the defendant], and who recognized him as the same individual throughout the encounter" and a law enforcement officer "testified that he saw [the defendant] discard the firearm[.]" <u>Morris</u>, 575 F. App'x at 176.

Here, the Government presented sufficient evidence from which the jury could determine that the Defendant was the individual who was carrying the firearms on September 14, 2018. The individual carrying the Armi Tanfoglio pistol identified himself as Tanner Larch to Sergeant Cabe. [T. at 8]. The individual carrying the Armi Tanfoglio pistol matched the description of the Defendant that Sergeant Cabe had received. [<u>Id.</u>]. The individual carrying the Armi Tanfoglio pistol also had tattoos on his neck, like the Defendant. [<u>Id.</u>]. Moreover, Sergeant Cabe testified that the individual who

dropped the Armi Tanfoglio pistol was the same person Sergeant Hooper ultimately arrested—the Defendant. [Id. at 14].

Trey Hamilton provided sufficient evidence regarding the identity of the individual carrying the Glock pistol. Hamilton testified that the individual carrying the Glock pistol had "tattoos, like, all on his arms and . . . neck[,]" "kind of short" hair, and was wearing a "white tee" with "a couple of designs." [Id. at 49]. The Defendant has tattoos that match the description given by Hamilton and was wearing a white shirt when he was arrested. [Id. at 95, 119]. Hamilton encountered the possessor of the Glock pistol near the area where Sergeant Cabe last saw the person who identified himself as the Defendant. Hamilton further testified that the individual ran towards the woods after their encounter, [T. at 56], which is where Sergeant Hooper subsequently arrested the Defendant. [Id. at 91].

Taking the evidence in the light most favorable to the Government, a rational trier of fact could have found beyond a reasonable doubt that the Defendant was the individual who possessed the Armi Tanfoglio pistol and the Glock pistol. See Higgs, 353 F.3d at 313. While an in-court identification is typically a feature element of the Government's presentation of the evidence in these kinds of cases, there is no requirement that the Government provide such an identification where there is sufficient other

evidence to show the individual's identity. <u>See</u> <u>Morris</u>, 575 F. App'x at 176. Because there is sufficient other evidence here, the Defendant's first argument in his Motion for Acquittal is without merit.

## 2. Suggestive Identification Procedures

The Defendant next argues that the testimony of Sergeant Cabe and Trey Hamilton was "unnecessarily suggestive and conducive to irreparable mistaken identification." [Doc. 92 at 8 (citing <u>Stovall v. Denno</u>, 388 U.S. 293 at 301-02 (1967)].[1] Specifically, the Defendant argues that none of the witnesses at trial specifically linked him to the individual who possessed the Armi Tanfoglio pistol until the prosecutor asked Sergeant Cabe where he "initially encountered the Defendant." [<u>Id</u>. at 5, 8-9].[2]

To begin, the cases to which the Defendant cites regarding identification procedures prone to "unnecessarily suggestive and conducive to irreparable mistaken identification[,]" [Doc. 92 at 8 (citing <u>Stovall</u>, 388 U.S. at 301-02], applies only to *out-of-court* identifications like photo arrays or police lineups. <u>See</u> <u>Manson v. Brathwaite</u>, 432 U.S. 98, 112 (1977) (stating that <u>Stovall</u> and its progeny strive to eliminate "law enforcement use of

---

[1] Contradicting his first argument, the Defendant now seems to argue that Sergeant Cabe and Trey Hamilton's testimony identified his client as the individual they encountered on September 14, 2018.

[2] The Defendant's counsel did not object to the prosecutor's line of questioning.

improper lineups, showups, and photo arrays[.]").  That language and case law has little applicability to *in-court* identifications in criminal matters like this one, where the circumstances necessarily suggest that the Defendant committed the crime.  See Perry v. New Hampshire, 565 U.S. 228, 244 (2012) (stating that "[m]ost eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do.").  Therefore, the Defendant's citation to the language from Stovall regarding identifications that are "unnecessarily suggestive and conducive to irreparable mistaken identification" is simply inapposite here.

The Defendant's argument related to the prosecutor being the first person to identify the Defendant also fails.  The Defendant's counsel never objected to the prosecutor's questioning on the basis that it presented facts that were not in evidence at that time.  Because the Defendant's counsel waived his objection to the purportedly improper questioning by failing to object at trial, the admission of that evidence is subject to plain error review. See United States v. McBride, 862 F.2d 1316, 1319 (8th Cir. 1988) ("Counsel cannot stand idly by, permit the presentation of erroneous matter at trial, and then complain about the inclusion of that evidence in the trial record, absent plain error").

To find plain error: "(1) there must be error; (2) it must be plain under current law; (3) it must affect substantial rights, typically meaning the defendant is prejudiced by the error in that it affected the outcome of the proceedings; and (4) the error [must have] seriously affected the fairness, integrity, or public reputation of judicial proceedings." United States v. West, 296 F. App'x 317, 319 (4th Cir. 2008) (citing United States v. Olano, 507 U.S. 725, 732-37 (1993)). When determining whether the error affected substantial rights under the third element of plain error review, the Court examines if "the error actually affected the outcome of the proceedings." United States v. Hastings, 134 F.3d 235, 240 (4th Cir.1998) (citations and quotations omitted). The Court must, therefore, look to the alleged errors in the context of the proceedings to determine whether the outcome was affected.

Even if it was improper for the prosecutor to ask a question that, for the first time, explicitly linked the Defendant to the individual described by Sergeant Cabe, allowing such question did not affect the outcome of the proceedings. As discussed above, there was ample other evidence from which the jury could conclude that the Defendant was the individual who

possessed the Armi Tanfoglio pistol and the Glock pistol.[3]  As such, any alleged error did not actually affect the outcome of the proceedings. Accordingly, it was not plain error to allow Sergeant Cabe and Trey Hamilton to testify after the prosecutor linked the Defendant to the individual they had encountered and the Defendant's second argument in his Motion for Acquittal is without merit.

Because the evidence identifying the Defendant as the individual who possessed the Armi Tanfoglio pistol and the Glock pistol was not dependent on any tainted identification, the totality of the evidence was sufficient to support the conviction.  Burgos, 94 F.3d at 871 (stating that "in reviewing the evidence, the Court must "not analyze evidence in a piecemeal manner, but must consider its cumulative effect . . . ."); see also Cote, 544 F.3d 88, 98 (4th Cir. 2008) (noting that the evidence must be reviewed "in its totality, not in isolation.").  As such, the Plaintiff's Motion for Acquittal will be denied.

---

[3] Moreover, a review of the testimony from Sergeant Cabe and Trey Hamilton demonstrates that they believed the individual they encountered on September 14, 2019 at Smoky Mountain High School was the Defendant.  Sergeant Cabe explicitly identified the Defendant as the person he encountered when he saw the Defendant after Sergeant Hooper arrested him.  [T. at 14].  Likewise, Trey Hamilton stated that while he did not know the individual he encountered on September 14 at the time, he knows who he is now.  [Id. at 48].

**B.     Defendant's Motion for a New Trial**

In his Motion for a New Trial, the Defendant contends he is entitled to relief from the jury's verdict because (1) the jury venire failed to reflect a fair cross-section of the community; (2) the Court failed to allow the jury to test the weight of the gun; (3) the Court admitted evidence in violation of the Confrontation Clause; (4) the Court failed to allow the Defendant to hold his case open for a tardy witness to testify; and (5) the Court failed to allow the Defendant to ask the Government's expert witness questions regarding mistakes in prior reports.  [Doc. 85 at 1-2].

**1.     Challenge to the Jury Venire**

The Defendant's first argument in support of his Motion for New Trial is that the jury venire failed to reflect a fair cross-section of the community as required by Duren v. Missouri, 439 U.S. 357, 364 (1979).  [Doc. 86 at 3-4].

The *voir dire* of the jury panel in this matter began on January 6, 2020. The Defendant's counsel did not raise an objection to the jury panel during *voir dire* or during trial.  It was not until January 21, 2020, when the Defendant filed his Motion for a New Trial, that the Defendant first raised an objection related to the composition of the jury panel.  [Doc. 85].

The Jury Selection and Service Act of 1968, 28 U.S.C. § 1867 (the "Act"), provides the "exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." 28 U.S.C. §1867(e). The Act allows "a defendant, before *voir dire*, to move for a dismissal of the indictment or a stay of the proceedings against him on the basis of substantial failure to comply with the Act's rules for jury selection." United States v. Meredith, 824 F.2d 1418, 1424 (4th Cir. 1987). A defendant also can move to dismiss the indictment or stay the proceedings within seven days after he or she "discovered or could have discovered, by the exercise of due diligence, the grounds" for the failure to comply with the Act's rules for jury selection. 28 U.S.C. §1867(a). Objections by a defendant that are "made subsequent both to the beginning of the *voir dire* examination and to a point seven days after they could have discovered the grounds for the challenge by the exercise of due diligence" are deemed waived. United States v. Webster, 639 F.2d 174, 180 (4th Cir. 1981), modified, 669 F.2d 185 (4th Cir. 1982).

Here, the Defendant did not object to the composition of the jury pool before *voir dire*. Further, while the Defendant raised this objection for the first time in his Motion for New Trial on January 21, 2020, he does not argue

or otherwise claim that January 21, 2020 was within seven days of the first time he "discovered or could have discovered, by the exercise of due diligence, the grounds" for the violation of the Act. 28 U.S.C. §1867(a). As such, the Defendant waived his objection to the jury venire because he failed to timely assert it under the procedures established in the Act. See Webster, 639 F.2d at 180. Accordingly, the Defendant's first argument in his Motion for New Trial is without merit.[4]

### 2. Jury's Examination of the Firearm

The Defendant's second argument in support of his Motion for New Trial is that the court erred by limiting the jury's examination of the Glock pistol after they requested to see it during deliberations. [Doc. 86 at 11; see also Doc. 82]. The Defendant further argues that the Court should have allowed the jury to physically handle the Glock pistol, rather than only allowing them to visually examine it in the courtroom.

During deliberations, the jury sent a note to the Court asking to see the Glock pistol and the shorts the Defendant was wearing on September 14, 2018. The Court discussed the matter with counsel, including the Court's

_____

[4] It should be noted that the Defendant's objection to the manner of calling the jury pool is based on his contention that using voter registration information violates the Sixth Amendment. This method of summoning jurors, however, has been expressly approved by the Fourth Circuit in U.S. v. Cecil, 836 F.2d 1431, 1448 (4th Cir. 1988). The Defendant's argument relies on the dissent in Cecil, not the decision of the Court.

concerns with allowing the jurors to handle a firearm.  The Court then replied to that note by bringing the jury back into the courtroom to visually examine the Glock pistol and physically examine the shorts.

"The district court has considerable discretion in the handling of exhibits during the court of the trial as well as during jury deliberations." United States v. Burrell, 963 F.2d 976, 982 (7th Cir. 1992).  Moreover, a district court "enjoys considerable discretion in construing the scope of a jury inquiry and in framing a response tailored to the inquiry." United States v. Rommy, 506 F.3d 108, 126 (2d Cir. 2007).  A district court's response to a jury's request regarding access to evidence is "reviewed under an abuse of discretion standard."  See United States v. Mueller, 405 F. App'x 648, 650 (3d Cir. 2010).

To "eliminate any chance of accident, weapons are generally not sent to the jury room."  Burrell, 963 F.2d at 982.  As such, a "district court's compromise of allowing each juror to examine the firearm . . . in open court, coupled with its admonishment that the jurors should not deliberate or have discussions while in open court, [is] reasonable and far from an abuse of discretion."  United States v. Almonte, 694 F. App'x 35, 38 (2d Cir. 2017); see also Mueller, 405 F. App'x at 650 (stating that a district court "did not abuse its discretion in limiting the jury's physical access to [a] handgun.").

The visual examination allowed by the Court fulfilled with the jury's request, which asked to *see* the Glock Pistol and the shorts.[5] Moreover, the decision to limit the jury's physical examination of the Glock pistol was within this Court's discretion. See id. As other courts have recognized, there are several concerns associated with allowing jurors to handle firearms, even within the confines of a courtroom. See Mueller, 405 F. App'x at 651. Accordingly, it was within the Court's discretion to only allow the jury to visually examine the Glock pistol in open court and not permit them to handle it. See id.[6] Therefore, the Defendant's second argument in support of his Motion for New Trial is without merit.

### 3. Confrontation Clause Violation

The Defendant's third argument in support of his Motion for New Trial is that the Court admitted evidence in violation of the Confrontation Clause. [Doc. 86 at 12]. Specifically, the Defendant argues that the Court should

---

[5] The jury did not submit any further notes after the visual examination and rendered a verdict shortly thereafter.

[6] To the extent that the Defendant argues that the Court's decision prohibited the jury from an opportunity to "feel the weight of the gun[,]" that argument also fails. The Defendant could have introduced evidence regarding the weight of the Glock pistol by other means, including by having a witness testify to the weight of the Glock pistol and then presenting an item of similar weight to the jury for physical examination. As such, the Court's decision to prohibit the physical examination of the Glock pistol did not deny the jury the ability to feel its physical weight because there were other means by which that evidence could have been entered.

have struck *sua sponte* Sergeant Scherman's testimony about the statements made by Nathaniel Coffey, Josh Jones, Justus Day, and Jackson Paulus. [Id.].

While Sergeant Scherman was searching for the individual who ran from Sergeant Cabe, he encountered Trey Hamilton, Nathaniel Coffey, Josh Jones, Justus Day, and Jackson Paulus shortly after their encounter with the individual who possessed the Glock pistol. [T. at 61]. At trial, Sergeant Scherman testified about that encounter as follows:

> When I got up to the area about where the new gym is I encountered a group of young men who were rather excited. They flagged me down, and I stopped just to briefly find out what they needed. They told me that a guy had just tried to carjack them and that they had taken a gun from him, and that they had the gun. And they told me that the male had proceeded on past the new gym towards Jones Street and Quality Plus.

[Id. at 61-62]. The Defendant did not object to that testimony at trial, despite the fact that Trey Hamilton was the only individual among that group who testified.

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against him." U.S. Const. amend. VI. As such, the Supreme Court has held that the Confrontation Clause bars the

"admission of testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 42 (2004). "The ultimate inquiry" to determining if a statement made during an emergency was testimonial "is whether the "'primary purpose of the interrogation was to enable police assistance to meet the ongoing emergency[,]'" Michigan v. Bryant, 562 U.S. 344, 374 (2011) (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)), rather than for the primary purpose of establishing or proving "past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822. To make that determination, the Court must "evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." Bryant, 562 U.S. at 359.

Here, there was clearly an "ongoing emergency" when Hamilton and his friends made that statement to Sergeant Scherman. See Bryant, 562 U.S. at 374. Hamilton and his friends gave their statement shortly after encountering an armed individual who attempted to carjack them during a crowded event at a public school. That individual was fleeing when Hamilton and his friends made their statement to Sergeant Scherman. Moreover, law enforcement officers were already responding to an ongoing emergency at that time because they were searching for a fleeing suspect who had

dropped a loaded firearm during the same crowded event at a public school. Under those facts, Sergeant Scherman was clearly responding to an ongoing public emergency when he encountered Hamilton and his friends.

Moreover, the statements from Trey Hamilton and his friends were made for the primary purpose of enabling police assistance to meet the ongoing emergency, not for the primary purpose of establishing or proving "past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822; Bryant, 562 U.S. at 374 (2011). Sergeant Scherman testified that when he encountered Hamilton and his friends, he "stopped just to briefly find out what they needed." [T. at 61]. He further testified that after quickly hearing what happened he "told them to wait right there, that I was going to go on with the other officers" to search for the individual they encountered because he "did not know the status of [the suspect] and whether he was in custody or if they were still trying to find him." [Id. at 62-64].

In light of those circumstances, it is clear that the statements to Sergeant Scherman were made "'to enable police assistance to meet the ongoing emergency[,]'" Bryant, 562 U.S. at 374 (quoting Davis, 547 U.S. at 822), and not for the primary purpose of establishing or proving "past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822. As

such, the statements Hamilton and his friends made to Sergeant Scherman fall outside of the scope of the Confrontation Clause because they were not testimonial in nature. Accordingly, it was not error to allow Sergeant Scherman's testimony regarding the statements from Hamilton and his friend. Therefore, the Defendant's third argument in support of his Motion for New Trial is without merit.

### 4.    Tardy Witness

The Defendant's fourth argument in support of his Motion for New Trial is that the Court erred by refusing to allow the Defendant to hold his case open for a tardy witness to testify. [Doc. 86 at 13].

At the beginning of the second day of trial, the Defendant called two witnesses to testify. The Defendant told the Court that Cherokee Court Magistrate Dick Crowe would be arriving later around 10:00 a.m. that morning to testify as his third and final witness. [T. at 4].

The Defendant's first two witnesses finished testifying at 10:04 a.m. [Id. at 57]. At that point, the Defendant's counsel asked the Court's indulgence to contact Magistrate Crowe to determine when he would be there. [Id.]. The Court permitted a brief recess so the Defendant could locate his witness. [Id. at 58]. The Defendant's counsel contacted Magistrate Crowe and told the Court that Magistrate Crowe would be there by 10:30

a.m.  [Id. at 58].  The Court decided to handle the pending administrative matters in the case to give Magistrate Crowe more time to arrive.  [Id. at 59]. Magistrate Crowe still had not arrived when the Court finished addressing those matters, so the Court recessed at 10:10 a.m. to give him more time. [T. at 61].  Magistrate Crowe still had not arrived when the Court returned from its recess.  At that point, the Court ordered the Defendant to proceed with his case.  The Defendant rested without presenting any further evidence.

In his Motion for New Trial, the Defendant proffers that Magistrate Crowe would have testified that he was at the football game on September 14 and that he saw the Defendant at the game.  [Doc. 86 at 13-14].  The Defendant also proffers that Magistrate Crowe would have testified that he did not see the Defendant with any handguns and that it would have been impossible for the Defendant to hide two handguns in the shorts he was wearing that night.  [Id. at 14].[7]

---

[7] The Defendant's argument is curious in light of the fact that it seeks to refute evidence that was not presented.  No one testified that the Defendant had both guns in his shorts. The Armi Tanfoglio pistol fell from the Defendant's shorts, but the Glock pistol was only seen in the Defendant's *hand*.  Prior to that, Sergeant Cabe testified that the Defendant was wearing a red jacket, which is a much more likely location of the Glock pistol.  As such, the proffered evidence is of essentially no probative value.  It should also be noted that the Defendant did not make this offer of proof at trial, but rather only when he filed his Motion for a New Trial.

"Questions of trial management are quintessentially the province of the district courts."  United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006).  Moreover, "district courts have an affirmative duty to prevent trials from becoming protracted and costly affairs."  Dorman v. Annapolis OB-GYN Assocs., P.A., 781 F. App'x 136, 148 (4th Cir. 2019).  As such, the Court has authority to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to (1) make those procedures effective for determining the truth; (2) *avoid wasting time*; and (3) protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a) (emphasis added).

Here, the Court properly determined that it could not hold this matter open indefinitely while it waited for the arrival of Magistrate Crowe. Magistrate Crowe was supposed to have arrived at the beginning of the Defendant's case.  Magistrate Crowe, however, still had not arrived after the Defendant had called two witnesses, examined them, and allowed the Government to cross-examine them.  Moreover, Magistrate Crowe still had not arrived after the Court handled the pending administrative matters in this case or after the Court recessed to give him more time to arrive.  In light of those facts, the Court could not continue to hold the jury and delay the trial

while it waited for Magistrate Crowe to arrive at some time in the future.[8]  As such, the Defendant's fourth argument in support of his Motion for New Trial is without merit.

### 5.    Mistakes in Prior Reports

The Defendant's fifth argument in support of his Motion for New Trial is that the Court erred by refusing to allow the Defendant to ask the Government's expert witness questions regarding mistakes in prior reports. [Doc. 86 at 14-15].  The Defendant argues that the questions would have shown "an error in the ATF's investigation," and, therefore, would have provided "an indictment of the witness and the investigation."  [Id. at 15].

At trial, Special Agent Heather Cox-McClain of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") testified regarding the nexus between the firearms and ammunition relevant in this case and interstate commerce.  [T. at 155].  On cross-examination, the Defendant's counsel asked Special Agent Cox-McClain whether she had reviewed an Interstate Nexus Report drafted by another ATF agent for this case that contained typographical errors.  [Id. at 159].  That Interstate Nexus Report incorrectly

---

[8] In addition, the Defendant's proffer that Magistrate Crowe would have testified that the Defendant was not carrying firearms at the football game is cumulative evidence because the Defendant's other two witnesses also testified that he was not carrying firearms at the football game.  See Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . undue delay, wasting time, or needlessly presenting cumulative evidence.").

stated that one of the firearms in question was a Taurus firearm with a serial number of 152288, which matched neither of the firearms at issue in this case. [Id. at 160].[9] The Government objected to the defense counsel's question and the Court sustained that objection.

While the Defendant argues that the Court improperly sustained that objection, he does not present any argument to show that sustaining that objection and preventing that line of questioning weighs so "heavily against the verdict that to deny a new trial would be contrary to the 'interests of justice.'" United States v. Newell, No. 1:14-CR-00022-MR-DLH, 2015 WL 892367, at *1 (W.D.N.C. Mar. 3, 2015) (Reidinger, J.) (citing Fed. R. Crim. P. 33(a)). The questions Defendant's counsel wanted to ask Special Agent Cox-McClain had no bearing on whether the Armi Tanfoglio pistol or the Glock pistol moved in interstate commerce, the sole issue implicated by her testimony. Moreover, the expert testimony of Special Agent Cox-McClain that the Armi Tanfoglio pistol and the Glock pistol moved in interstate commerce was uncontroverted. And there was no evidence that the Defendant ever possessed a Taurus pistol. As such, even if it was error to sustain the Government's objection to the Defendant's counsel's questions

---

[9] The Government contends that the mistake was a typographical error. [Doc. 93 at 12].

to Special Agent Cox-McClain, that error does not rise to the level of necessitating a new trial. Accordingly, the Defendant's fifth argument in support of his Motion for New Trial is without merit.

## V.     CONCLUSION

Because the Defendant's arguments in support of his Renewed Motion for Acquittal [Doc. 87] and Motion for New Trial [Doc. 85] are without merit, those motions will be denied.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Renewed Motion for Acquittal [Doc. 87] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Defendant's Motion for New Trial [Doc. 85] is hereby **DENIED**.

Signed: March 2, 2020

Martin Reidinger
United States District Judge